# WILLIE ANDREWS v. STATE OF MARYLAND

[No. 139, September Term, 1980.]

*Decided October 28, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Michael R. Malloy, Assistant Public Defender,* with whom

was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Ann E. Singleton, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court. ELDRIDGE, COLE and DAVIDSON, JJ., dissent. ELDRIDGE, J., filed a dissenting opinion at page 640 *infra,* in which COLE and DAVIDSON, JJ., concur.

We shall here reject the contention of petitioner Willie Andrews that his rights under U. S. Const., Amend. V and Maryland Declaration of Rights, Art. 22 were infringed when a trial judge ordered him "to refrain from shaving his head and facial hair until the conclusion of [his] trial" on then pending criminal charges.

Andrews ultimately was convicted by a Montgomery County jury of assault with intent to murder, use of a handgun in the commission of a felony (two counts), and armed robbery (six counts). The twenty year sentences imposed for each of the armed robbery charges run concurrently with each other, but the sum total of the consecutive sentences imposed is eighty years.

The incident prompting the charges here before the Court took place early on the morning of December 22, 1978, at the Albee Shoe Store in Rockville. Andrews was arrested on January 6, 1979.

The State filed a motion on March 2 to compel Andrews to refrain from shaving his face and head. The motion was accompanied by a memorandum giving the details of the incident and other relevant information, including that the robbery occurred about 9:00 a.m. on December 22; that the suspect in question ran to a certain address where investigation indicated he had spent the preceding night; that the person's name was Willie Andrews; that upon entering the apartment Andrews informed those present that he had just robbed a shoe store and shot a man; that police searches of

apartments in that area "resulted in the seizure of several items of evidence, including a razor and a sponge which had hair clippings on them," and that these items of evidence and hair clippings had been preserved and remained in the custody of the Montgomery County Police. The State "aver[red] that the only fair identification that c[ould] be made [was] one based upon the defendant's appearance at the time of the commission of the crimes and not one based upon his subsequent drastically altered appearance."

The State's motion was considered by the trial judge (Fairbanks, J.) at the time of Andrews' arraignment. Evidence adduced by the State in support of its motion consisted of testimony by Detective Orbin of the Montgomery County Police Department and Betty Brown, one of the occupants of the apartment where Andrews resided. Orbin stated that as a result of the interview of all of the witnesses at the store, seven in number, the suspect for whom they were looking was described as a black male in his late 20's to 30, approximately five feet eight inches to six feet tall, medium build, short hair, with head hair and a thin beard and mustache. He said none of the seven people indicated that the man in question was wearing any sort of disguise on his face. When the defendant was arrested he was almost completely bald but he did have what was described as "a full-thin beard and a mustache." Orbin asserted that on the day the crime was committed a search was made of the apartment where Andrews lived. A pair of scissors, a sponge, a rag, and a bottle of Nair were found.

Brown said she had known Andrews for about one year prior to the incident in question. He had been occupying the same apartment with her and others for about a month and a half. He was in the apartment when she went to sleep about 5:00 o'clock in the morning. She described him as "sweaty and . . . out of breath" when he came into the apartment sometime after she awoke at about 9:00 a.m. According to her, he said he had shot a man in the head and that he had robbed a shoe store in Rockville. He had with him bags from Albee's Shoe Store which were described as made of thick plastic. She said that he indicated that there were about

eight people in the store, including one lady who was pregnant. According to Brown, at the time these statements were being made, Andrews had head hair, sideburns, a mustache, and a beard. He had had such for the whole year she had known him. Prior to December 22 she had never seen him without a beard or a mustache. Brown claimed that Andrews asked her to help him shave his hair, saying "the policeman was out there." In response to a question as to whether or not she observed any police, Mrs. Brown said she looked out a window and saw "[a]n army of polices." She thought there were about ten police cars. She testified, "I used some Nair and a disposable razor and helped him shave off his hair on his face and his head." This was done in the bathroom of her apartment. She also shaved his head, "but not completely" because "[t]here wasn't enough Nair and the razor wasn't sharp enough." In response to a question as to his appearance in the courtroom at the time of the hearing on the motion as compared with the morning of the incident in question, she said, "His face hair is shorter, hair off his face." On cross-examination, Mrs. Brown indicated that the police requested and were granted permission to search the apartment. She told them where the Nair and razor blade were. She also stated that Andrews left the apartment about 6:00 or 6:30 a.m., without explaining how she knew this in light of the fact that she had previously said he was there when she went to sleep about 5:00 o'clock.

The trial judge heard the matter on Friday, March 9, 1979. He deferred a decision until the following Monday. At that time he stated:

> The State argues that the court is fully entitled to require the defendant to refrain from altering his appearance. Well, that would require the defendant to refrain from shaving either his head or his facial hair and cites to the court a long line of cases from a good many jurisdictions, including federal jurisdictions and including one case from the Fourth Circuit ... all to the effect that the court has the right to require certain things of the defendant

including such matters as where to sit in the courtroom and ranging all the way to that to taking blood from him or certain appertures and openings into his body.

I have read not all of those cases but some of them, and I am persuaded that the State is correct, that there is no constitutional impediment to requiring the defendant to refrain from shaving. Among the reasons why this is appropriate is that the defendant, by attempting to alter his appearance is attempting to defeat legitimate avenues of identification. All of the cases that I have read which discuss this matter are uniform in their condemnation of disguise on the part of an accused, which disguise is used either for purposes of attempted escape or attempted avoidance of identification at a later date.

. . . [B]ased on what I believe the appropriate law to be this court will pass an order directed to the defendant ordering him to refrain from shaving his head and facial hair until the conclusion of the trial in the above-captioned case.

The Court of Special Appeals affirmed the judgment of the circuit court in an unreported opinion. We then granted Andrews' petition for the writ of certiorari to consider his contentions that his constitutional rights have been infringed.

Judge Cole pointed out for the Court in *Richardson v. State,* 285 Md. 261, 265, 401 A.2d 1021 (1979), that the constitutional safeguards of the Fifth Amendment to the Constitution of the United States relative to compelling a person in a criminal case to be a witness against himself and the privilege against compelled self-incrimination contained in Maryland Declaration of Rights, Art. 22 have "long been recognized as being in pari materia" with each other. Of course, as Judge Digges recently said for the Court in a slightly different context in *Attorney General v. Waldron,* 289 Md. 683, 714, 426 A.2d 929 (1981), although a clause of

the United States Constitution and one in our own Declaration of Rights may be "in pari materia," and thus "decisions applying one provision are persuasive authority in cases involving the other, we reiterate that each provision is independent, and a violation of one is not necessarily a violation of the other." Here, however, we see no reason for a holding under Declaration of Rights, Art. 22, other than as the Supreme Court has construed the Fifth Amendment.

Justice Brennan discussed the Fifth Amendment for the Court in *Schmerber v. California,* 384 U. S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), stating:

> History and a long line of authorities in lower courts have consistently limited its protection to situations in which the State seeks to submerge those values by obtaining the evidence against an accused through "the cruel, simple expedient of compelling it from his own mouth. . . . In sum, the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' " *Ibid.* The leading case in this Court is *Holt v. United States,* 218 U. S. 245. There the question was whether evidence was admissible that the accused, prior to trial and over his protest, put on a blouse that fitted him. It was contended that compelling the accused to submit to the demand that he model the blouse violated the privilege. Mr. Justice Holmes, speaking for the Court, rejected the argument as "based upon an extravagant extension of the Fifth Amendment," and went on to say: "[T]he prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof." 218 U. S., at 252-253.

It is clear that the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. *Boyd v. United States,* 116 U. S. 616. On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling "communications" or "testimony," but that compulsion which makes a suspect or accused the source of "real or physical evidence" does not violate it. [*Id.* at 762-64.]

*Accord, United States v. Dionisio,* 410 U. S. 1, 5-6, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), quoting *Schmerber* and *Holt v. United States,* 218 U. S. 245, 252-53, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), and noting that the Court in *Schmerber* relied upon *Holt.*

In *United States v. Wade,* 388 U. S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), "[a] man with a small strip of tape on each side of his face entered [and robbed a] bank . . . ." A police lineup was arranged composed of Wade and other prisoners where "[e]ach person in the line wore strips of tape such as allegedly worn by the robber and upon direction each said something like 'put the money in the bag,' the words allegedly uttered by the robber." *Id.* at 220. There Justice Brennan referred for the Court to *Schmerber* and *Holt* in concluding that "[n]either the lineup itself nor anything shown by this record that Wade was required to do in the lineup violated his privilege against self-incrimination." *Id.* at 221. He further said for the Court:

We have no doubt that compelling the accused merely to exhibit his person for observation by a

prosecution witness prior to trial involves no compulsion of the accused to give evidence having testimonial significance. It is compulsion of the accused to exhibit his physical characteristics, not compulsion to disclose any knowledge he might have. It is no different from compelling Schmerber to provide a blood sample or Holt to wear the blouse, and, as in those instances, is not within the cover of the privilege. Similarly, compelling Wade to speak within hearing distance of the witnesses, even to utter words purportedly uttered by the robber, was not compulsion to utter statements of a "testimonial" nature; he was required to use his voice as an identifying physical characteristic, not to speak his guilt. We held in *Schmerber, supra,* at 761, that the distinction to be drawn under the Fifth Amendment privilege against self-incrimination is one between an accused's "communications" in whatever form, vocal or physical, and "compulsion which makes a suspect or accused the source of 'real or physical evidence,'" *Schmerber, supra,* at 764. We recognized that "both federal and state courts have usually held that . . . [the privilege] offers no protection against compulsion to submit to fingerprinting, photography, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." *Id.,* at 764. None of these activities becomes testimonial within the scope of the privilege because required of the accused in a pretrial lineup. [*Id.* at 222-23.]

*United States v. Lamb,* 575 F.2d 1310 (10th Cir.), *cert. denied sub nom. Clary v. United States,* 439 U. S. 854 (1978), is closely analogous factually to the case at bar. There a hearing was held on the Government's motion that Lamb shave his beard. As the court put it, "The trial judge ordered that Lamb shave his beard where testimony indicated that Lamb had been clean-shaven at the time of the robbery, and that, therefore, Lamb's beard was an attempt to disguise his

appearance to prevent trial identification." *Id.* at 1316. It said that his "claim that this order violated his Fifth Amendment privilege against self-incrimination [was] without merit." *Id.*

A number of other Federal appellate cases shed some light on the issue now before the Court. For example, in *United States v. Satterfield,* 572 F.2d 687 (9th Cir.), *cert. denied,* 439 U. S. 840 (1978), bank surveillance photographs showed that robbers wore masks. Satterfield made a motion that he should not be required to wear a stocking mask before the jury. On three occasions during the trial he was required to don a mask. The court found no abuse of discretion, saying:

> The wearing of the disguises aided the jury in its fact-finding function. By seeing for itself Satterfield in disguises, it could better evaluate the ability of the eyewitnesses to recognize a masked person on different occasions. The third wearing of the disguises also helped the jury to judge for itself whether the individual in the bank surveillance photographs was Satterfield. [*Id.* at 690.]

In *United States v. Jackson,* 476 F.2d 249 (7th Cir. 1973), the prosecutor commented to the jury relative to the fact that the defendant had changed his appearance. There was evidence to the effect that the supposed criminal had "an Afro haircut and a mustache but no beard." However, "[p]rior to the lineup and trial, the defendant had cropped his hair short, shaved off his mustache and sideburns, and had grown a goatee." *Id.* at 251. The court said:

> Compelling a suspect to submit to a withdrawal of a sample of his blood for analysis for alcohol content and the admission in evidence of the analysis report are not compulsion prohibited by the privilege against self-incrimination. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Compelling a person to speak within hearing distance of the witnesses and even to utter words purportedly uttered by a bank robber are not

prohibited compulsion. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Nor is the compelled production of recorded voice exemplars constitutionally prohibited. United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). Nor is the compelled production of handwriting exemplars within the Fifth Amendment protection. Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); United States v. Mara, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973); United States v. Rogers, 475 F.2d 821 (7th Cir. 1973).

This authority would seem to support a requirement that defendant appear in court for identification as he appeared at the occurrence or at least as he appeared before he changed his physical appearance. But we need not go that far in this case because the court made no such requirement. The cases undoubtedly support the lesser tool for the prosecution, that is, commenting upon the change of appearance and introducing evidence that such change actually occurred and when it took place, in combating what is apparently becoming a popular defense tactic. [*Id.* at 253.]

A bank teller testified in *United States v. Gaines,* 450 F.2d 186 (3d Cir. 1971), *cert. denied,* 405 U.S. 927 (1972), that during a robbery a man wearing a black and white scarf around the lower part of his face appeared next to the counter. She tentatively identified the defendant but stated positive identification was difficult because he was partly masked at the time of the robbery. The court held "[h]is contention that it was improper to expose him for identification . . . with a scarf around his face [was] without merit." *Id.* at 195.

Judge Kaufman in the United States District Court for the District of Maryland signed an order in *United States v. Hammond,* 419 F.2d 166 (4th Cir. 1969), *cert. denied,* 397 U.S. 1068 (1970), which required Hammond to appear in any

lineup scheduled by the Government at reasonable times and places and "to wear any clothing or items, such as a false goatee; to speak any words; to walk in any manner; or to take any physical stance that may be required" to aid witnesses in comparing him with persons who participated in the bank robberies. Hammond was found guilty of criminal contempt because he refused to obey this order. He contended on appeal that the order requiring him to wear a goatee violated his constitutional rights in that he would be denied due process of law and his privilege against self-incrimination, and, therefore, that the order was invalid and incapable of supporting his conviction for criminal contempt. The court pointed out that the proposed lineup would have been similar to that conducted in *Wade*. It said, "We find this contention to be without merit." *Id.* at 168.

Yet another federal case having similarities to the one at bar is *United States v. Wilcox,* 507 F.2d 364 (4th Cir. 1974), *cert. denied,* 420 U. S. 979 (1975). At a lineup, the accused was required to wear a hat and sunglasses and to speak the words uttered by the bank robber at the time of the commission of the crime. As a result, he was positively identified by one of the victims. The court cited *Wade* and *Gilbert v. California,* 388 U.S. 263, 266, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), in finding no violation of his privilege against self-incrimination and in stating, "An accused at a lineup may be required to don disguises worn, to take stances assumed, or to speak words uttered by the perpetrator of the crime." *Id.* at 367.

Decisions in state courts of last resort shedding light here include *LaBlanc v. People,* 160 Colo. 575, 418 P.2d 888, 890 (1966), *cert. denied,* 388 U.S. 922 (1967) (No error in requiring the defendant to put on a sweat shirt with hood attached since "[i]t gave the jury an opportunity to see him as the victim saw him, and had a bearing on the accuracy of his identification."); *Commonwealth v. Tarver,* 369 Mass. 302, 305, 345 N.E.2d 671 (1975) (Samples of defendant's hair were snipped from his head, chest and pubic area. These samples, together with expert testimony concerning

comparison with hair taken from the clothing of the victim, were admitted in evidence. The court said, "The defendant, correctly we believe, does not contend that there is any violation of the Fifth Amendment or Sixth Amendment to the United States Constitution."); *People v. Cwikla,* 46 N.Y.2d 434, 444, 386 N.E.2d 1070 (1979) (Court held that it was not error to compel a defendant to conform his appearance at the lineup to his appearance at the time of the crime by wearing a wig.); and *State v. Perry,* 291 N.C. 284, 288-91, 230 S.E.2d 141 (1976) (No error in requiring a defendant to stand before the jury and place an orange stocking mask over his head and face in the way that a witness had testified it was worn by the man who robbed and shot her after an attempt on cross-examination of the witness to cast doubt upon her ability to identify the defendant as the robber so masked.).

*People v. Strauss,* 174 Misc. 881, 22 N.Y.S.2d 155 (1940), is not from a court of last resort but it is of interest here. There the prosecutor moved for an order requiring that the defendant have the hair on his scalp forcibly trimmed for the purpose of his appearance in court for trial. The court said, "It appears that while incarcerated awaiting trial, defendant has changed his appearance by permitting his hair to go untrimmed and by refusing to be shaved. His scalp hair is long and his face is substantially hidden by a heavy beard." *Id.* at 156. It rejected his constitutional objections, saying, "The constitutional safeguard, Const. art. 1, § 6, against compelling a defendant in a criminal proceeding to be a witness against himself does not apply. That refers to testimonial compulsion, as a 'witness', at a court hearing or trial, and the word 'witness' is the key word." (Citing a number of cases from New York and elsewhere including *Holt,* 218 U.S. 245. Also cited was 7 J. Wigmore, *Evidence,* §§ 2263 and 2265 (3d ed. 1940).) In the concluding paragraph of the opinion it is stated:

> The defendant's argument that this being a natural, rather than an artificially applied, disguise, provides a controlling basis for distinction, is not well taken. In all moot matters the stretching of

basic assumptions may admit of sufficient in logic to support either side of the question. Therein lies the peril to sensible decision. That peril should be avoided here. Sound public policy seems to be the determining factor in a holding, which is now made, that any and all manner of disguise, whether naturally or artificially applied, is intolerable where — with all legitimate individual rights duly respected — a public right may be invaded by the use of a disguise with the reasonable likelihood of impeding thereby the enforcement of criminal law. [*Id.* at 157.]

Andrews places his principal reliance upon *Allen v. State,* 183 Md. 603, 39 A.2d 820 (1944). It was alleged there that prior to trial, Allen had been shown a hat "and then not only admitted it to be his but, after trying it on, actually claimed it." *Id.* at 605. However, at trial "he took the stand as a witness in his own behalf and categorically denied ownership of this hat." *Id.* Over his objection, he was required on cross-examination to try on the hat. Judge Ridgely P. Melvin, Sr., said for the Court:

The issue of law directly raised by this exception is whether or not the Court's ruling thereon was a violation of the guaranty of the Maryland Declaration of Rights, Article 22, "That no man ought to be compelled to give evidence against himself in a criminal case." In *pari materia* with this Article is the Fifth Amendment to the Constitution of the United States, which provides that no person "shall be compelled in any Criminal Case to be a witness against himself." [*Id.* at 606.]

The Court reversed, but described "[t]he facts of th[at] case [as] bring[ing] it close to the borderline in applying the doctrine against compulsory self-incrimination . . . ." *Id.* at 613. Prior to that statement the Court said:

In the case at bar it was unnecessary for the State to have called upon the defendant to try on the hat

in question to bolster up its evidence that he, as the alleged owner of it, was the perpetrator of the crime. The State had already produced evidence that he was the owner, but, instead of relying upon this, the prosecution went a step too far in seeking to make the defendant supply a connecting link in the chain of circumstantial evidence against him.

It is to be borne in mind that the particular purpose in seeking to have the accused try on the hat was not to aid in identifying him by showing how he looked with it on or off, as in the case of *People v. Pecho,* [362 Ill. 568, 200 N.E. 860 (1936)], but was for the sole purpose of attempting to prove his ownership of this incriminating article. If the conformity or fit of the hat had been perfect, or convincingly close to perfection, that fact would have appeared from the enforced action of the accused. If the result of the experiment had been otherwise, as claimed by him, the very fact that he objected to making it would have been prejudicial. In either event, it amounted to a clear case of testimonial compulsion. See *State v. Griffin,* [129 S.C. 200, 124 S.E. 81 (1924)]. [*Id.* at 612-13.]

It will be seen immediately that the facts of this case are in no way analogous to that before the Court in *Allen.* The sole purpose there, as the Court pointed out, was an attempt to prove his ownership of the incriminating article, a fact which would have aided an inference of guilt. This amounted to a clear case of testimonial compulsion. It is significant that one may infer from the language of the second paragraph we have quoted above that the Court would have reached a different result had the hat been tried on for purposes of identification only. Another factor to be considered in the use of *Allen* is the language used by the Court in *Williams v. State,* 231 Md. 83, 188 A.2d 543, *cert. denied,* 375 U. S. 851 (1963), in commenting upon *Allen.* The accused relied upon *Allen,* contending that he was deprived of his right to immunity from self-incrimination when he

complied with an officer's request to exhibit his arms imme-diately subsequent to his arrest, the case being one involving narcotics. The Court said, "The appellant relies upon *Allen v. State,* 183 Md. 603. But that case, *if correctly decided,* has been confined to its particular facts and has no application to tests or observations made by third persons out of court." *Id.* at 86-87 (emphasis added). Also, in *Dyson v. State,* 238 Md. 398, 209 A.2d 609, *reargument denied,* 238 Md. 546, *vacated and remanded on other grounds,* 383 U.S. 106 (1966), Judge Hammond said for the Court:

> The record offers no support for appellant's claim that he was unconstitutionally required to incrimi-nate himself when he was taken to the captain's office to meet Mrs. Kelly. All that appears is that Mrs. Kelly did not recognize Dyson until he said he did not know her and then, apparently, she remembered his voice. This Court, as have many others, consistently has held that requiring a suspect before trial to assume a posture or give his fingerprints or put on clothing similar to that worn by the criminal at the time of the commission of the crime, or *otherwise reasonably to present his physi-cal attributes as an aid or guide to identification, does not amount to requiring the suspect to incrimi-nate himself or affront any other of his constitutional rights. Williams v. State,* 231 Md. 83, 86-87; *Davis v. State,* 189 Md. 640, 644; *Shanks v. State,* 185 Md. 437, 444; *cf. Lenoir v. State,* [197 Md. 495, 80 A.2d 3 (1951)]; 13 Md. L. Rev. 31, 33; 17 Md. L. Rev. 193, 208-211. [*Id.* at 404 (emphasis added).]

We hark back to the classic statement by Justice Holmes for the Court in *Holt* that "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." 218 U.S. at 252-53. Put another way for the Court by Justice Brennan in *Schmerber,* "[T]he privilege is a bar against compelling

'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." 384 U.S. at 764.

The statements by Justices Holmes and Brennan for the Supreme Court are in accord with the views of Dean Wigmore. The issue here may be put in better perspective by noting that 8 J. Wigmore, *Evidence* § 2263 (McNaughton Rev. 1961), states relative to the form of disclosure protected:

> The *history* of the privilege (§ 2250 *supra*) — especially the spirit of the struggle by which its establishment came about — suggests that the privilege is limited to testimonial disclosures. It was directed at the employment of legal process to *extract from the person's own lips* an admission of guilt, which would thus take the place of other evidence. That is, it was intended to prevent the use of legal compulsion to extract from the person a sworn communication of his knowledge of facts which would incriminate him. Such was the process of the ecclesiastical court, as opposed through two centuries — the inquisitorial method of putting the accused upon his oath in order to supply the lack of the required two witnesses. Such was the complaint of Lilburn and his fellow objectors, that he ought to be convicted by other evidence and not by his own forced confession upon oath.
>
> Such, too, is the main thrust of the *policies* of the privilege (§ 2251 *supra*). While the policies admittedly apply to some extent to nontestimonial cooperation, it is in testimonial disclosures only that the oath and private thoughts and beliefs of the individual — and therefore the fundamental sentiments supporting the privilege — are involved.
>
> In other words, it is not merely any and every *compulsion* that is the kernel of the privilege, in history and in the constitutional definitions, but *testimonial* compulsion. The latter idea is as essen-

tial as the former. [*Id.* at 378-79 (emphasis in original).]

Cases generally seem to be in agreement that it is testimonial compulsion against which protection is afforded, and that, in the absence of testimonial compulsion, a reversal of a conviction is justified only by that which amounts to a denial of due process under the concept of fundamental fairness. See Annots., 3 A.L.R. 4th 374 (1981), 22 L. Ed. 2d 909 (1970), and 16 L. Ed. 2d 908 (1967). The extremes are best represented by *Rochin v. California,* 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183 (1952), and *Breithaupt v. Abram,* 352 U.S. 432, 77 S. Ct. 408, 1 L. Ed. 2d 448 (1957).

In *Rochin,* officers broke into the home of the accused, and then observed him place something in his mouth. Justice Frankfurter described the subsequent events:

A struggle ensued, in the course of which the three officers "jumped upon him" and attempted to extract the capsules. The force they applied proved unavailing against Rochin's resistance. He was handcuffed and taken to a hospital. At the direction of one of the officers a doctor forced an emetic solution through a tube into Rochin's stomach against his will. This "stomach pumping" produced vomiting. In the vomited matter were found two capsules which proved to contain morphine. [*Id.* at 166.]

In concluding that this was not permissible conduct, Justice Frankfurter said for the Court:

[W]e are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents — this course of proceeding

by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation. [*Id.* at 172.]

*Breithaupt* concerned the extraction of blood for the purpose of testing its alcoholic content. The driver was unconscious when the blood was taken. Justice Clark said for the Court, "[T]here is nothing 'brutal' or 'offensive' in the taking of a sample of blood when done, as in this case, under the protective eye of a physician." 352 U.S. at 435. The Court "conclude[d] that a blood test taken by a skilled technician is not such 'conduct that shocks the conscience,' *Rochin, supra,* at 172, nor such a method of obtaining evidence that it offends a 'sense of justice,' *Brown v. Mississippi,* 297 U.S. 278, 285-286 (1936)." 352 U.S. at 436-37.

That which took place here does not amount to a denial of due process under a concept of fundamental fairness, nor was there testimonial compulsion. Here there was evidence adduced, believed by the trial judge, to the effect that the accused had changed his appearance in a manner that might make it difficult to identify him as the culprit responsible for the depredations for which he was being prosecuted. Moreover, it appeared that the change in appearance was made immediately after the commission of the crime in a deliberate attempt to avoid identification. The order here went no further than to require the defendant to maintain an appearance that most nearly corresponded with what a woman in the apartment where he resided testified had been his appearance for the preceding year. This in no way compelled him to give evidence against himself. It was not, as is urged upon us, an effort to have him conform to the appearance of the culprit as described by the witnesses. The Court in *Wade* upheld the placement of a strip of tape on the side of the face of the accused, yet that does seem to be an attempt to conform to that which witnesses had described. Andrews here was simply directed to maintain a natural appearance. In the words of Justice Brennan for the Court in *Wade,* what we have here "is compulsion of the accused to

exhibit his physical characteristics, not compulsion to disclose any knowledge he might have." 388 U.S. at 222. It would make a mockery of court proceedings if an accused were to be permitted to alter deliberately his appearance in an effort to avoid conviction. To hold that the court's order infringed upon the defendant's right not to incriminate himself would come dangerously close to saying that an accused has a constitutional right to commit perjury in his defense. The court's order here, designed to restrain the deception of Andrews, infringes upon no constitutional right of the accused.

*Judgment affirmed; appellant to pay the costs.*

Eldridge, J., dissenting:

The majority decides that a trial court may order a criminal defendant to alter his organic appearance and to change a personal habit in order that he may better coincide with the prosecution's description of the perpetrator of the crime. This decision goes far beyond the cases, relied on by the majority, dealing with federal constitutional principles. Moreover, it does not comport with Article 22 of the Maryland Declaration of Rights as applied by this Court.

I.

In order to appreciate the reach of the majority's decision, it is necessary to distinguish between the undisputed facts of the case, which relate to the time period from and after petitioner's arrest, and the State's factual allegations connecting petitioner to the crimes. At the time he was alleged to have perpetrated the crimes, and for nearly a year preceding that date, petitioner supposedly sported sideburns, a mustache, a beard and a full head of hair. These allegations were supported by the testimony of the State's witness Betty Brown, who claimed that she had helped petitioner remove most of that tonsorial matter immediately

after petitioner had allegedly entered her apartment and announced his commission of the crimes with which he was later charged. But it is undisputed that when petitioner was arrested, more than two weeks after the crimes were committed, the police found him almost completely bald, although he did wear "a chin beard and a mustache." The State, having difficulty in obtaining a positive identification of petitioner as the perpetrator by any one of at least three witnesses, thereupon requested that petitioner be ordered to refrain from shaving his head and his facial hair. The court, finding no constitutional impediment to such an order, granted the State's motion.

The trial judge stated that the order was consistent with constitutional requirements because

> "the defendant, *by attempting to alter his appearance* is attempting to defeat legitimate avenues of identification. All of the cases that I have read which discuss this matter are uniform in their condemnation of *disguise on the part of the accused,* which disguise is used either for purposes of attempted escape or attempted avoidance of identification at a later date." (Emphasis added.)

But the crux of the issue lies here: how did the trial judge know that petitioner had attempted to alter his bodily appearance and that his appearance at the time of arrest was indeed a disguise?

The petitioner did not attempt, after he was arrested and first seen by law enforcement officials, to change his appearance. Instead, the trial court ordered that the petitioner refrain from shaving and thereby modify his bodily features which existed at the time of the arrest. The effect of the order was to make petitioner's features conform to the State's description of the perpetrator of the crimes. This was coercing the petitioner to change his appearance in order to incriminate himself. The trial court's finding of "disguise" was based upon the court's crediting the State's identification evidence linking petitioner to the crimes. However, in

642

a criminal case where the defendant has demanded a jury trial, the Sixth Amendment makes this a function of the jury and not the court.

This is not a "disguise" case similar to any relied on in the State's brief and in the majority opinion. One category of "disguise" cases involves the situation of a defendant who, at the time of his arrest, very much resembles the witnesses' descriptions of the perpetrator of the crime. But *after* arrest, while in jail pending trial, the defendant intentionally alters or attempts to alter his bodily appearance by, for example, shaving when he had a beard at the time of arrest or refraining from shaving when he was clean-shaven at the time of arrest. In these instances, courts have held that it is permissible to order the defendant to restore and maintain his appearance to that of the time of arrest. This was the situation in *United States v. Lamb,* 575 F.2d 1310 (10th Cir.), *cert. denied sub nom. Clary v. United States,* 439 U.S. 854, 99 S.Ct. 165, 58 L.Ed.2d 160 (1978), a case relied on heavily by the majority. *See also Dove v. State,* 47 Md.App. 452, 423 A.2d 597 (1980); *State v. Byrne,* 595 S.W.2d 301 (Mo.App. 1979), application for appeal to the Supreme Court of Mo., *denied,* April 8, 1980, *cert. denied,* 449 U.S. 951, 101 S.Ct. 355, 66 L.Ed.2d 215 (1980).

In another category of "disguise" cases, the perpetrator of the crime uses certain clothing or accessories to create a disguise at the time of the commission of the crime. Such disguises have included a scarf over the face, *United States v. Gaines,* 450 F.2d 186, 195-96 (3d Cir. 1971), *cert. denied,* 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972), or a jacket and sunglasses, *Lucero v. People,* 166 Colo. 233, 237, 442 P.2d 820 (1968), or strips of tape on the face, *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). A variation on this line of cases occurs when the perpetrator of the crime, while not necessarily "disguised," wears a particular item of clothing, such as a hat, *State v. Williams,* 307 Minn. 191, 239 N.W.2d 222 (Minn. 1976), or a blouse, *Holt v. United States,* 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021

(1910), and then at some time abandons the garment. In all of these cases, also, it has been held that the defendant may properly be called upon to try on, briefly for identification purposes, the garments or accessories. *Holt v. United States, supra. See also U.S. v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1967).

The holdings in the above cited disguise cases are squared with the Fifth Amendment's self-incrimination clause on the theory that the privilege against compelled self-incrimination generally applies only to oral or written material which is testimonial or communicative. *Schmerber v. California,* 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *see Fisher v. United States,* 425 U.S. 391, 411, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). It has been held that the use of the actual body of the defendant for a demonstration is ordinarily not a communicative or testimonial activity within the protection of the Fifth Amendment.

However, the principle that compelled interference with the defendant's body does not implicate the concept of self-incrimination is not absolute. In certain situations, forceable interference with the defendant's body has been held to violate the prohibition against compulsory self-incrimination applicable to State proceedings under the Fourteenth Amendment. *See, e.g., Rochin v. California,* 342 U.S. 165, 172-74, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

The decision of the court today goes far beyond any of the cases upholding the use of a defendant's body as evidence. Here we have a suspect who was clean shaven at the time of arrest, and the trial court ordered him to grow hair. The trial court may have believed that it was directing the petitioner to stop trying to disguise himself. But the only basis for this belief was the trial court's crediting the prosecution's evidence linking the petitioner to the crimes. By believing the State's allegations, and finding that the petitioner's appearance was a disguise, the court seemed to assume that the defendant was guilty until proven innocent. In other words, the trial court necessarily had to accept the testimony of the State's witnesses Betty Brown and Detective Orbin,

indicating that the petitioner was the person who had committed the crimes, that he had changed his bodily appearance soon after, and that this was the reason he did not resemble the other witnesses' descriptions of the perpetrator. However, whether to believe the State's identification evidence relating to the period soon after the crimes were committed, was a matter for the jury and not the court under the jury trial clause of the Sixth Amendment. By ordering petitioner to stop shaving, the court was ordering him to assume an appearance comporting with the State's description of the perpetrator, in order that the petitioner could less burdensomely (for the State) be prosecuted and convicted.

The trial court in this case was not ordering petitioner to give a brief demonstration by putting on an item of clothing. Nor was the court ordering petitioner to refrain from changing his features as they existed when he was arrested and first seen by law enforcement officials. Rather, the court was ordering him to try to look more like the person for whom the State was looking. The court was ordering a man, who, for all the court properly knew, had been clean shaven all of his life and was not the guilty party, to change his personal toilet habits, to change the status quo of his bodily features, and to assume a different appearance. Simply stated, the court was taking an individual and trying to make him fit the description of the perpetrator of the crimes. I have been unable to find any case which goes so far. The majority decision cannot, in my judgment, be reconciled with the Fifth Amendment's self-incrimination clause, with the right to a jury trial guaranteed by the Sixth Amendment, and with the Fourteenth Amendment's due process clause.

II

In addition to the federal constitutional problems presented in this case, I believe that the trial court's order was inconsistent with Art. 22 of the Maryland Declaration of Rights, which provides "[t]hat no man ought to be compelled to give evidence against himself in a criminal case."

In *Allen v. State,* 183 Md. 603, 39 A.2d 820 (1944), this Court made it clear that Art. 22 of the Declaration of Rights encompasses more than oral testimony, and that it embraces certain physical demonstrations linking the defendant with the crime.

In *Allen* the trial judge made the defendant, in open court, try on a hat which allegedly belonged to the perpetrator of the crime, in order to show that the defendant might be the owner of the hat and thus the guilty party. This Court, rejecting the line of cases which viewed the privilege against self-incrimination as limited to testimonial evidence, held that the trial court's order violated Art. 22.

Although the facts of the *Allen* case may be different from those in the case at bar, the principles announced by this Court in *Allen* clearly require a reversal in the present case. After discussing the history of the prohibition against compulsory self-incrimination, Judge Melvin for the Court stated that "[t]he principle has always been liberally construed in order to give the fullest effect to this immunity," 183 Md. at 607. This Court then acknowledged that cases throughout the country were in disagreement as to how far the prosecution could go in compelling a defendant "to perform some affirmative act to aid the State in connecting him with the crime . . . ." *Id.* at 607-608. The Court then aligned itself with cases such as *Ward v. State,* 27 Okl. Cr. 362, 228 P. 498 (1924) and others, holding that the privilege against compulsory self-incrimination "embraces as well the involuntary furnishing of evidence by the accused by some affirmative act in open court which might aid in establishing his guilt." 183 Md. at 609. The *Allen* Court set forth the governing standard as follows (*id.* at 611):

> "[T]he test is who furnished or produced the evidence? If the accused, especially if in open court and on the witness stand, is made to do so by performing an act or experimentation which might aid in connecting him with the crime and establishing his guilt, it is inadmissible."

The Court in *Allen* concluded by stating that under Art. 22, "judicial protection is afforded an accused from being compelled to perform an evidence-producing act," and that "[s]uch an interpretation, we think, conforms to the true spirit of this ancient principle of law and gives to it the best effect in dealing with the human, personal rights which it was designed to safeguard." 183 Md. at 613.

Applying the above principles to the present case certainly should lead to a reversal. This is not a mere identification case, where the defendant is required to exhibit passively his body to the jury or permit it to be fingerprinted. Rather, the defendant was required to perform the affirmative act of changing his body from its appearance when he was first arrested, and first seen by the police and the court, in order to produce evidence connecting him with the crime. He was required to sit in open court throughout the entire trial, exhibiting to the jury the change forced upon his bodily features so that he would resemble the State's description of the perpetrator. In the language of the *Allen* test, the defendant was being made to furnish evidence in open court "by performing an act or experimentation which might aid in connecting him with the crime and establishing his guilt . . . ." 183 Md. at 611.[1]

### III

The ramifications of the majority's holding in this case are alarming. For example, suppose the prosecution's evidence shows that the perpetrator of a crime is very fat, and suppose that the defendant when arrested many months later is quite thin. Under the majority's decision, if the prosecution

---

1. The majority relies on the statement by Judge Henderson for the Court in Williams v. State, 231 Md. 83, 86-87, 188 A.2d 543, *cert. denied,* 375 U.S. 851, 84 S.Ct. 109, 11 L.Ed.2d 78 (1963), that *Allen* has "no application to tests or observations made by third persons out of court." Assuming the correctness of this limitation, it has no relevance to the present case. The trial court in the case at bar ordered the change in the petitioner's bodily features, and petitioner was required to sit throughout the trial exhibiting the changed features to the jury.

can produce a witness stating that, immediately after the crime, the defendant took steps to alter his appearance by going on a diet, presumably the trial court can order that the defendant be fattened up, and force fed, much like the goose whose liver will become pate. Other possibilities of grotesque situations arising under today's ruling are perhaps better left to the imagination.

Finally, in the instant case it was totally unnecessary for the prosecutor to have requested an order requiring the petitioner to change his features. The State had convincing evidence that petitioner, immediately after the crime, had indeed altered his appearance. The evidence consisted of testimony by a witness, Mrs. Brown, with whom petitioner shared an apartment and who claimed that she actually helped petitioner remove hair from his head. In addition, the State had as evidence a sponge and a razor on which hair was found, all from Mrs. Brown's apartment. This evidence, if it had been presented to the jury, would, in the context of all of the other evidence, have been just as strong as the exhibition of the petitioner with the compelled bodily changes. In its presentation, the State could have argued that it was unable to obtain a satisfactory identification of defendant as the perpetrator because he had disguised himself by shaving his hair. Such a line of argument has been held to be entirely proper, *United States v. Jackson,* 476 F.2d 249, 253 (7th Cir. 1973).

The principal danger of today's decision is that it sanctions the trial court's assumption that the man charged is indeed the guilty party. It sanctions the trial court's acceptance of the State's evidence indicating that the reason the defendant does not fit the witnesses' descriptions of the criminal is because he had disguised himself. These are not matters for the court to pass upon but, instead, should be reserved for the jury. While it is clear that a defendant who deliberately changes his appearance *after* his arrest may be ordered to revert to the appearance at the time of his arrest, the converse is not true. A party who does not alter his appearance after his arrest should not be compelled to

change his organic features later in order to fit the prosecutor's description of the perpetrator. No case cited by the majority upholds such a practice. The practice cannot, in my view, be reconciled with federal and state constitutional principles.

Judges Cole and Davidson have authorized me to state that they concur with the views expressed herein.